## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA

FELECIA HAWKINS, on behalf of herself
and all others similarly situated,

       Plaintiff,                Case No. 1:22-CV-04462

v

CMG MEDIA CORPORATION
(d/b/a Cox Media Group),

       Defendant.

---

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT'S MOTION TO COMPEL ARBITRATION**

---

# TABLE OF CONTENTS

TABLE OF CONTENTS............................................................................................................2

TABLE OF AUTHORITIES...................................................................................................3

INTRODUCTION ....................................................................................................................5

BACKGROUND.......................................................................................................................6

LEGAL STANDARD ...............................................................................................................8

ARGUMENT.............................................................................................................................9

    I.    Plaintiff Did Not Agree to The Arbitration Agreement ....................................9

CONCLUSION.......................................................................................................................17

# TABLE OF AUTHORITIES

Page(s)

### Cases

*B&Z Auto Enters. v. Autotrader*, 2017 WL 7611519 (N.D. Ga. Mar. 13, 2017) . 8, 9

*Braundmeier v. Ancestry.Com Operations Inc.*, 2022 U.S. Dist. LEXIS 212415 (N.D. Ill. Nov. 23, 2022) .................................................................................. 10

*Cox v. Midland Funding, LLC*, 2015 WL 12862931 (N.D. Ga. June 11, 2015) 9, 10

*Fridman v. 1-800 Contacts, Inc.*, 554 F.Supp.3d 1252 (S.D. Fla. 2021) ......... 15, 17

*Goldstein v. Fandango Media, LLC*, 2021 WL 6617447 (S.D. Fla. July 27, 2021) ................................................................................................................... 15, 16

*HD Supply Construction Supply, Ltd. v. Mowers*, 2020 WL 5774786 (N.D. Ga. Sept. 28, 2020) ....................................................................................... 13

*Knapke v. PeopleConnect, Inc.*, 38 F. 4th 824 (9th Cir. 2022) ........................ 10, 11

*Kravets v. Anthropologie, Inc.*, 2022 WL 1978712 (S.D. Fla. June 6, 2022) ........ 15

*Lukis v. Whitepages Inc.*, 549 F. Supp. 3d 798 (N.D. Ill. 2021) ............................ 10

*Mason v. Midland Funding LLC*, 2018 WL 9439879 (N.D. Ga. Sept. 5, 2018).... 13

*Nguyen v. Barnes & Noble*, 763 F.3d 1171 (9th Cir. 2014) .................................. 16

*Ruthrauff v. Luminess Direct, LLC*, *5 (N.D., Ga. Dec. 6, 2018 .......................... 10

*Selden v. Airbnb, Inc.*, 2016 WL 6476934 (D.D.C. Nov. 1, 2016) ........................ 15

*Starke v. Gilt Groupe, Inc*., 2014 WL 1652225 (S.D.N.Y. Apr. 24, 2014)............ 14

*Thornton v. Uber Techs., Inc*., 858 S.E.2d 255 (Ga. Ct. App. 2021) ..................... 14

*White v. Ring LLC*, 2023 WL 1097554 (C.D. Cal. Jan. 25, 2023) ......................... 14

### Statutes

18 U.S.C. § 2710......................................................................................... 5, 7

## INTRODUCTION

Defendant surreptitiously disclosed personally identifiable information about thousands of its subscribers, including Plaintiff, using a code analytics tool called Facebook Pixel, which Defendant covertly implemented on its websites. Defendant disclosed this information without the knowledge or consent of website users for its own pecuniary gain. Defendant violated the Video Privacy Protection Act, 18 U.S.C. § 2710 each time it made such disclosures. With this illicit practice exposed, Defendant now attempts to evade responsibility by relying on an arbitration agreement to which Plaintiff Hawkins (the only remaining plaintiff) never agreed.[1]

Remarkably and in betrayal of its later arguments, Defendant first argues that Plaintiff assented to its arbitration provision *when her counsel accessed and referenced Defendant's terms and conditions.* ECF No. 23-1, 7. It should be obvious that if it were ever accepted, this unserious but potentially dangerous argument would prohibit attorneys from investigating and preparing their clients' claims. In any event, Defendant does not and cannot offer any authority for the proposition that a lawyer who views a website's terms and conditions could possibly bind his or her client to them.

---

[1] Plaintiff Hawkins does not concede that Mr. Bienkowski or anyone else ever agreed to arbitrate any claims against Defendant, but because Mr. Bienkowski has dismissed his claims does not respond to Defendant's assertions that relate specifically to Mr. Bienkowski.

Defendant then argues that Plaintiff assented to its "2016 Terms," which contained its "Arbitration Agreement." ECF No. 23-1, 17. It describes the process through which it asserts she so assented as a "sign-in wrap." *Id.* at 23. But what Defendant claims Plaintiff clicked through was neither a sign-in wrap nor a browse-wrap. In sharp contrast to the facts at issue in the authority proffered by Defendant, the panel Defendant claims Plaintiff was shown contains no language whatsoever that would seek or obtain her consent to be bound by Defendant's Terms.

Merely placing a link to a website's Terms and Conditions on a sign-up page without in any way indicating that taking an action on that page will purportedly bind the user to detailed contractual provisions (including the waiver of important rights) falls woefully short of what is required to create a contract. Defendant's sign-up process inarguably never placed Plaintiff on notice of the arbitration provision it now seeks to use to shield itself against her claim or sought her consent thereto. Defendant's motion must therefore be denied.

## BACKGROUND

Defendant is a media corporation that developed, owns, and/or operates a platform of websites, including wsbtv.com (the "Website"). ECF No. 21, ¶¶2, 6, 9.[2] The Website provides a wide array of video content, and Defendant has thousands

---

[2] Hereinafter, the First Amended Class Action Complaint will be referenced solely by paragraph symbol ("¶") and paragraph number.

of subscribers, including Plaintiff, who watch videos on the Website. ¶¶2, 15-16. When Plaintiff (like other users) watches videos on Defendant's Website, the URL, video name/description, and her Facebook ID ("FID") are simultaneously sent to Facebook via Facebook Pixel. ¶¶26-28. Together, this information identifies Plaintiff and the specific video material she viewed (i.e. it is personally identifiable information; "PII"). ¶¶31-35, 60, 75. Defendant did not obtain Plaintiff's consent to disclose her PII, nor did it provide a clear and conspicuous opportunity for her to withdraw from such disclosure. ¶¶61-62, 76-77. The Video Privacy Protection Act, 18 U.S.C. § 2710 (the "VPPA") prohibits disclosures of this very nature and provides that "Any person aggrieved by any act of a person in violation of [the VPPA] may bring a civil action in a United States district court." 18 U.S.C. § 2710(c)(1).

Accordingly, Plaintiff filed this putative class action in this Court, whereby she asserts claims pursuant to the VPPA and seeks relief for herself and all others similarly situated. ECF No. 1. On March 13, 2023, Plaintiff filed her First Amended Complaint, wherein she maintains the same claims and seeks the same relief, but added detail to her allegations. ECF No. 21. On March 27, 2023, Defendant filed a Motion to Compel Arbitration (the "Motion") based on an arbitration agreement buried in its Terms of Service. ECF No. 23-1. Defendant also contends that Plaintiff subscribed to the Website on August 23, 2022 using her Facebook account and assented to the same arbitration agreement via a what it contends a "sign-in wrap"

agreement. ECF No. 23-1 at 16-18, 23-28. However, the process through which Defendant contends Plaintiff signed up never asked for or obtained her assent to Defendant's Terms, it merely linked them inconspicuously without any indication as to the effect or significance of the link. As a result, no contract was ever formed.

## LEGAL STANDARD

Although "doubts concerning the *scope* of an arbitration clause should be resolved in favor of arbitration, the presumption does not apply to disputes concerning whether an agreement to arbitrate has been made." *B&Z Auto Enters. v. Autotrader*, 2017 WL 7611519, *2 (N.D. Ga. Mar. 13, 2017) (emphasis added). "The existence of an agreement to arbitrate between the parties is simply a matter of contract." *Id*. (internal quotation marks omitted). "Therefore, in construing arbitration agreements, courts apply state-law principles relating to contract formation, interpretation, and enforceability." *Id*. "The existence and terms of a contract must be proven by a preponderance of the evidence." *Id*. "The first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute." *Id.*

"[A]n order to arbitrate a contested agreement is in effect a summary disposition of the issue of whether or not there had been a meeting of the minds on the agreement to arbitrate." *Id*. (internal quotation marks omitted). Accordingly, "the Eleventh Circuit applies a standard akin to that used in summary judgment." *Id*. "A

8

genuine factual dispute concerning contract formation precludes a court from deciding as a matter of law whether the parties entered into an agreement to arbitrate." *Id*. "A district court considering the making of an agreement to arbitrate should give to the party denying the agreement the benefit of all reasonable doubts and inferences that may arise." *Id*.

## ARGUMENT

**I.     Plaintiff Did Not Agree To The Arbitration Agreement.**

Defendant seeks to force Plaintiff to arbitrate her claim despite the fact that she never assented to any arbitration agreement. *See* Ex. 1, Declaration of Plaintiff Hawkins, ¶4. "[P]arties cannot be forced to submit to arbitration if they have not agreed to do so." *Cox v. Midland Funding, LLC*, 2015 WL 12862931, *6 (N.D. Ga. June 11, 2015). "[T]he Court generally looks to Georgia state law to determine whether an agreement to arbitrate was formed between a plaintiff and defendant." *Id*. at 7. "A contract is valid if there is a subject matter of the contract, consideration and mutual assent." *Id*. "Defendants ultimately bear the burden to show the existence of an arbitration agreement." *Id*. A defendant must also establish that plaintiff was aware of, and assented to, the arbitration agreement. *Id*. at 7-8. "[T]he question of whether a party has assented to the contract is generally a matter for the jury." *Ruthrauff v. Luminess Direct, LLC*, *5 (N.D. Ga. Dec. 6, 2018).

9

Defendant initially suggests that Plaintiff agreed to arbitration based on her attorneys accessing Defendant's Terms of Service. ECF No. 23-1 at 20-21. In making this argument, Defendant relies on *Knapke*, a Ninth Circuit decision applying Washington law. *Id*. (citing *Knapke v. PeopleConnect, Inc*., 38 F. 4th 824, 828–29 (9th Cir. 2022)). The *Knapke* court did not conclude that a plaintiff had been bound to a contract by the actions of her counsel, but merely allowed for some discovery on the relationship between plaintiff and her counsel where counsel subscribed to defendant's website and indisputably agreed to defendant's terms of service. *Knapke*, 38 F. 4th at 828-829. Courts have flatly rejected the application of *Knapke* that Defendant advances. *See, e.g., Braundmeier v. Ancestry.Com Operations Inc.*, No. 20 C 7390, 2022 U.S. Dist. LEXIS 212415, at *8 (N.D. Ill. Nov. 23, 2022) ("[such a] ruling—that a lawyer could unintentionally force clients into arbitration by conducting routine research—would disincentivize fact-checking and burden the litigation process by making lawyers either file complaints with unverified information or seek basic knowledge through onerous discovery"); *Lukis v. Whitepages Inc.*, 549 F. Supp. 3d 798, 808 (N.D. Ill. 2021) ("Any contrary rule would have absurd consequences, allowing attorneys to ratify contracts on behalf of hundreds, thousands, or even millions of people just by filing a class action complaint.").

Here, in stark contrast to *Knapke*, nothing suggests that Plaintiff's counsel subscribed to Defendant's Website or agreed to Defendant's Terms of Service (they did neither), much less on behalf of Plaintiff. *Knapke* has no application to the materially different circumstances of this case and Defendant's reliance on *Knapke* is entirely misplaced.

As to Plaintiff herself, Defendant asserts that she subscribed to Defendant's Website using her Facebook account (i.e. clicking the blue "Continue as" button):



ECF No. 23-1 at 17 (Figure 2). Defendant contends that by clicking "Continue," Plaintiff Hawkins assented to the arbitration agreement "via a valid sign-in wrap,"

11

whereby she "agreed that her information would be exchanged between CMG and Facebook, and the same disclosure contained a prominent hyperlink to the 2016 terms," which contained the arbitration agreement. ECF No. 23-1 at 23-24. However, it is clear from the screenshot and Defendant's submissions that Plaintiff Hawkins did not agree to or accept the arbitration agreement by clicking continue or by signing in. *Id*. Rather, Defendant's Privacy Policy and Terms (containing the arbitration agreement) were merely hyperlinked and Website users, such as Plaintiff Hawkins, could continue/sign in without ever being told that they were agreeing to any terms of any kind.

The issue here is not simply that Plaintiff did not read the terms; she was never informed that clicking the button or proceeding further in the sign-up process would bind her to them, whatever they might say. In the cases cited by Defendant, each plaintiff was presented with such language. Here, the terms were merely linked in a remarkably inconspicuous manner (in a similar color without any underlining) with no indication that any action Plaintiff might take would bind her to them.

Georgia law is definitive that at most, hyperlinked agreements (provided, unlike here, that they are presented alongside language indicating their effect) constitute browsewrap agreements. *HD Supply Construction Supply, Ltd. v. Mowers*, 2020 WL 5774786 *6 (N.D. Ga. Sept. 28, 2020) (holding that hyperlinked terms and conditions are browsewrap agreements). Accordingly, Defendant's arguments

regarding sign-in wrap agreements are irrelevant. ECF No. 23-1 at 23-26. Moreover, the cases Defendant relies upon are entirely distinguishable because they involved circumstances where individuals explicitly agreed to terms and conditions by subscribing/signing in, which is not the case here. *Id*.

*Mason* involved Utah law, a clickwrap agreement where the Plaintiff "click[ed] a box that stated '***Yes! I accept these terms***[.]'" *Mason v. Midland Funding LLC*, 2018 WL 9439879, at *2 (N.D. Ga. Sept. 5, 2018) (emphasis added). In *White*, "customers [were] advised: ***By selecting 'Sign In' you are agreeing to [Defendant's] Terms and Conditions***..." *White v. Ring LLC*, 2023 WL 1097554, *2 (C.D. Cal. Jan. 25, 2023) (emphasis added). The court also noted, "With respect to agreements entered into online, courts have found that 'browsewrap' agreements are unenforceable." *Id*. at 4. *Thornton* involved circumstances similar to *White*: "***by creating an Uber account, you agree to our terms & conditions***." *Thornton v. Uber Techs., Inc*., 858 S.E.2d 255, 259 (Ga. Ct. App. 2021) (emphasis added). Here, Defendant's Privacy Policy and Terms were hyperlinked, however, there is no language akin to that in *White* or *Thornton* about agreeing to those provisions by continuing/signing in. ECF No. 23-1 at 17 (Figure 2).

In *Starke*, subscribing "included a sign-up box which state[d] that the consumer will become a Gilt member ***and agrees to be bound by the Terms of Membership***." *Starke v. Gilt Groupe, In*c. 2014 WL 1652225, *1 (S.D.N.Y. Apr.

13

24, 2014) (emphasis added). Further, "By joining Gilt through email or Facebook sign-up, *you agree to the Terms of Membership for all Gilt Groupe sites*." *Id.* (emphasis added). As mentioned above, Plaintiff Hawkins did not encounter or agree to any such language when clicking "Continue as" and subscribing to Defendant's Website. ECF No. 23-1 at 17 (Figure 2).

In *Selden*, the sign-up button included "By signing up, *I agree to Airbnb's Terms of Service, Privacy Policy, Guest Refund Policy, and Host Guarantee Terms*." *Selden v. Airbnb, Inc.*, 2016 WL 6476934, at *2 (D.D.C. Nov. 1, 2016) (emphasis added). Again, Plaintiff Hawkins' subscription to the Website was not contingent on agreeing to Defendant's Privacy Policy or Terms, which were merely and inconspicuously hyperlinked. ECF No. 23-1 at 17 (Figure 2). None of the cases Defendant relies upon are relevant or suggest that a valid agreement to arbitrate can be formed in the absence of any language informing a user that they are agreeing to a website's terms.

Defendant's reliance on *Kravets* and its suggestion that the hyperlink to Website Terms is "conspicuous" and would "put a reasonably prudent person on inquiry notice" of the arbitration agreement is belied by a simple look at the page. ECF No. 23-1 at 26-28 (citing *Kravets v. Anthropologie, Inc.*, 2022 WL 1978712, *4 (S.D. Fla. June 6, 2022)). As apparent from the Figure 2 screenshot, the hyperlinked Privacy Policy and Terms are located at the bottom of the window in

14

the smallest font present. ECF No. 23-1 at 17 (Figure 2). Contrary to what Defendant claims, the hyperlinks are not "bright blue" – they are pale blue, not underlined, and hardly stand out from the surrounding grey font. ECF No. 23-1 at 27. Such hyperlinks do not put Website users, such as Plaintiff, on notice of the arbitration agreement. S*ee, e.g., Fridman v. 1-800 Contacts, Inc*., 554 F.Supp.3d 1252, 1261 (S.D. Fla. 2021).

Defendant also asserts that the "notice" shown in Figure 2 includes "an invitation to learn more," however, the "Learn more" hyperlink appears related to some other webpage. ECF No. 23-1 at 17 (Figure 2), 27. Defendant does not aver, and nothing suggests, that the "Learn more" hyperlink pertains to the arbitration agreement. *Id*.

Further, the Terms hyperlink, which purportedly leads to the arbitration agreement, is placed below the prominent "Continue" button. ECF No. 23-1 at 17 (Figure 2). This "inconspicuous appearance and poor placement" would not make a reasonably prudent person aware of the arbitration agreement because "[i]t is not reasonable to expect a user to continue reading below the highly conspicuous [Continue] button." *Goldstein v. Fandango Media, LLC*, 2021 WL 6617447, *3 (S.D. Fla. July 27, 2021); *see also Nguyen v. Barnes & Noble*, 763 F.3d 1171, 1179 (9th Cir. 2014) ("Close proximity of the hyperlink to relevant buttons users must click on—without more—is insufficient to give rise to constructive notice."). The

15

subscription process for Plaintiff Hawkins, including the screen shown in Figure 2, did not put her on notice of the arbitration agreement.

Defendant also argues that a reasonable person (Plaintiff Hawkins) should have been put on notice of the arbitration agreement by "the footer of wsbtv.com's homepage and individual webpages," but that text is no more conspicuous than that shown at Figure 2 and this argument fails for the same reasons outlined above. ECF No. 23-1 at 17 (Figure 2), 28. Additionally, courts have found that hyperlinked terms at the bottom of webpages do not put website users on notice. *See, e.g., Fridman*, 554 F.Supp.3d 1252, 1261-1262 ("the hyperlink to the Terms is not prominent or particularly remarkable at the bottom of the pages" where it "would require a user to scroll to the bottom of the page to see it.").

Moreover, the arbitration agreement is a collateral hyperlinked document, however, none of the hyperlinks Defendant relies upon specify or describe the arbitration agreement. ECF No. 23-1 at 20. Eleventh Circuit Courts have held that,

> a hyperlink to [Defendant's] Terms and Policies without referencing the arbitration agreement… does not indicate, much less sufficiently describe, the collateral Arbitration Agreement that is contained in [Defendant's] Terms and Policies.

*Goldstein*, 2021 WL 661744 at 4. Where hyperlinks do not indicate or describe an arbitration agreement, "a reasonable user would not be on inquiry notice of [Defendant's] arbitration provision, and thus, an agreement to arbitrate was never formed." *Id*.

None of the screenshots or hyperlinks Defendant relies upon indicate or describe the arbitration agreement (e.g. there is no hyperlink entitled "Arbitration Agreement" or mention of an arbitration agreement). ECF No. 23-1 at 17 (Figure 2), 27-28. Accordingly, Plaintiff Hawkins was not on notice of the arbitration agreement and an agreement to arbitrate was never formed. *Goldstein,* 2021 WL 661744 at 4. Plaintiff Hawkins was not aware of the arbitration agreement, did not assent to the arbitration agreement, and never agreed to arbitrate her claims against Defendant. Defendant's Motion should be denied.

## CONCLUSION

Plaintiff never agreed to arbitrate any claims against Defendant. She therefore respectfully requests that Defendant's Motion to Compel Arbitration be denied.

| | |
|---|---|
| Date: April 10, 2023 | Respectfully submitted, |
| | s/     *Kurt G. Kastorf*_____ <br> Kurt G. Kastorf <br> **KASTORF LAW LLC** <br> 1387 Iverson Street NE, Suite 100 <br> Atlanta, GA 30307 <br> T: (404) 900-0330 <br> E: kurt@kastorflaw.com <br><br> Nicholas A. Coulson* <br> Lance Spitzig* <br> *Admitted *pro hac vice* <br> **LIDDLE SHEETS COULSON P.C.** <br> 975 East Jefferson Avenue <br> Detroit, Michigan 48207-3101 |

T: (313) 392-0015
E: ncoulson@lsccounsel.com
E: lspitzig@lsccounsel.com

*Attorneys for Plaintiff and the Putative Class*

# LR 5.1 CERTIFICATION

      The undersigned hereby certifies that this memorandum has been prepared in Times New Roman, 14-point font, as approved by the Court and in accordance with LR 5.1.

                                                     s/     *Kurt G. Kastorf*_____
                                                   Kurt G. Kastorf

# CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of April, 2023, I served a copy of the foregoing via the Court's electronic filing system upon the following:

Tiana Demas*
*Admitted *pro hac vice*
**COOLEY LLP**
110 N. Wacker Drive, Suite 4200
Chicago, IL 60606-1511
T: (312) 881-6500
E: tdemas@cooley.com

David Mills*
Shane Rogers*
*Admitted *pro hac vice*
**COOLEY LLP**
1299 Pennsylvania Ave NW, Suite 700
Washington, DC 20004
T: (202) 776-2273
E: dmills@cooley.com
E: srogers@cooley.com

James A. Demetry
**DEMETRY, DECARLO & COFFMAN**
3666 N. Peachtree Road, Suite 100
Chamblee, GA 30341
T: (770) 274-4383
E: jdemetry@demetrydecarlo.com

*Attorneys for Defendant*

                                          s/    *Kurt G. Kastorf*_____
                                          Kurt G. Kastorf