UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FELICIA HAWKINS, on behalf of
herself and all others similarly situated,

Plaintiff,

v.

CMG MEDIA CORPORATION (d/b/a
COX MEDIA GROUP),

Defendant.

CIVIL ACTION NO.
1:22-CV-04462-JPB

## ORDER

This matter is before the Court on CMG Media Corporation's ("Defendant")

Motion to Compel Arbitration [Doc. 23]. This Court finds as follows:

## PROCEDURAL HISTORY

Felicia Hawkins ("Plaintiff") filed this class action complaint against

Defendant on November 8, 2022.[1] [Doc. 1]. Plaintiff amended her complaint on

March 13, 2023. [Doc. 21]. In the amended pleading, Plaintiff, a subscriber to

Defendant's website WSBTV.com, alleges that Defendant illegally shared her

personal identifiable information without her consent in violation of the Video

Privacy Protection Act.

---

[1] When the suit was filed, Edward Bienkowski was also a named plaintiff. He voluntarily
dismissed his claims on April 10, 2023.

On March 27, 2023, Defendant filed the instant Motion to Compel Arbitration.  [Doc. 23].  In the motion, Defendant asks the Court to compel the parties to arbitration and stay the case.  In short, Defendant asserts that this Court should compel arbitration because Plaintiff assented to an arbitration agreement when she created her WSBTV.com account via the Facebook platform.

## FACTS

WSBTV.com is a website which hosts local news content consisting of written articles and video clips.  [Doc. 23-2, p. 4].  Although the website's content is free and generally available to the public, WSBTV.com users may register for an account.  Id.  One way a user can register for an account is by logging in through Facebook, Google or Amazon.  Id. at 13.

On August 23, 2022, Plaintiff registered for a WSBTV.com account by selecting the option to log in through Facebook.  Id. at 12.  Once Plaintiff clicked on that option, Plaintiff was led to the webpage shown in Figure 1 below.  Id. at 14. Figure 1 shows that the webpage contained an option to "continue" or "cancel." Under those options was the following text:  "By continuing, Cox Media Group Memberships JR will receive ongoing access to the information you share and Facebook will record when Cox Media Group Members JR accesses it.  Learn more about this sharing and the settings you have.  Cox Media Group

Memberships JR's Privacy Policy and Terms."  The words "Privacy Policy" and "Terms," which were on the bottom line, were hyperlinked and set off in blue text. Ultimately, Plaintiff selected "continue."



*Figure 1, WSBTV.com login through Facebook screen.*

As stated above, on the login through Facebook screen, the word "Terms" was hyperlinked.  If clicked on, a user would be taken to the Visitor Agreement. The Visitor Agreement stated that it "is a binding legal contract between you and the CMG Affiliate that operates this website . . . .  By using our website, application, mobile application and/or any services offered through our website, application, and/or mobile application . . . , you accept the terms of this

agreement." <u>Id.</u> at 58.  Particularly relevant here, the Visitor Agreement contained

the following arbitration provision:

> **DISPUTE RESOLUTION**
>
> **You and the cmg affiliate that operates the Service agree to arbitrate – rather than litigate in court – any and all claims or disputes between the parties (INCLUDING ANY parents, subsidiaries, AFFILIATES, officers, directors, employees, OR agents OF OURS) that arise out of or in any way relate to this SERVICE AND PRODUCTS OR services that we, OUR AFFILIATES AND/[O]R OUR SERVICE PROVIDER (ON OUR BEHALF) MAY provide to you in connection with YOUR USE OF THIS SERVICE; PROVIDED, HOWEVER, THAT IN NO EVENT SHALL THIS PROVISION PREVENT YOU FROM FILING OR JOINING A COMPLAINT WITH ANY FEDERAL, STATE, OR LOCAL GOVERNMENT AGENCY THAT IS AUTHORIZED BY LAW TO SEEK RELIEF AGAINST us ON YOUR BEHALF. [T]he arbitration between you and the cmg affiliate that operates the Service will be binding AND JUDGMENT ON THE AWARD RENDERED IN THE ARBITRATION MAY BE ENTERED IN ANY COURT HAVING JURISDICTION THEREOF.**
>
> In arbitration, there is <u>no judge</u> and <u>no jury</u>, and review of arbitration decisions in the courts is very limited. Instead, disputes will be resolved by an arbitrator, whose authority is governed by the terms of this Agreement. You and the CMG Affiliate that operates the Service agree that an arbitrator may only award such relief as a court of competent jurisdiction could award, limited to the same extent as a court would limit relief pursuant to the terms of this Agreement. An arbitrator may award attorneys' fees and costs if a court would be authorized to do so, and may issue injunctive or declaratory relief if that relief is required or authorized by the applicable law, but that injunctive or declaratory relief may not extend beyond you and your dealings with us. Discovery may be limited in arbitration, and procedures are more streamlined than in court. Notwithstanding this

arbitration agreement, you and the CMG Affiliate that operates the Service may bring appropriate claims against each other in small claims court, if the claims fall within the small claims court's jurisdiction, or any other federal, state, or local government agency authorized by law to hear your claims.

Id. at 15-16.

## DISCUSSION

Defendant asks the Court to compel arbitration under the Federal Arbitration Act ("FAA"). The FAA "places arbitration agreements on equal footing with other contracts and requires courts to enforce them according to their terms." Hearn v. Comcast Cable Commc'ns, LLC, 992 F.3d 1209, 1213 (11th Cir. 2021) (quoting Rent-A-Center, W., Inc. v. Jackson, 561 U.S. 63, 67 (2010)). Significantly, the Eleventh Circuit Court of Appeals has held that the FAA "establishes a liberal federal policy favoring arbitration agreements" and "any doubts concerning the scope of arbitrable issues" should be construed in favor of arbitration. Id.

A strong presumption exists in favor of arbitration; however, the FAA does not require the parties to arbitrate if they have not agreed to do so. Paladino v. Avnet Comp. Tech., Inc., 134 F.3d 1054, 1057 (11th Cir. 1998). Thus, any presumption favoring arbitration does not apply to disputes about whether an agreement to arbitrate has been made. Dasher v. RBC Bank (USA), 745 F.3d 1111, 1116 (11th Cir. 2014).

Whether the parties have agreed to arbitrate is "simply a matter of contract." First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 943 (1995). Thus, in deciding whether an agreement to arbitrate exists, courts apply state law principles relating to contract formation, interpretation and enforceability. Caley v. Gulfstream Aerospace Corp., 428 F.3d 1359, 1367-68 (11th Cir. 2005). In a case like this, where it is disputed as to whether the parties agreed to arbitration, courts should apply a standard akin to that used in summary judgment "in deciding what is sufficient evidence to require a trial on the issue of whether there was an agreement to arbitrate." Magnolia Cap. Advisors, Inc. v. Bear Stearns & Co., 272 F. App'x 782, 785-86 (11th Cir. 2008). Notably, a genuine factual dispute concerning contract formation precludes a court from deciding as a matter of law whether the parties entered into an arbitration agreement. See Granite Rock Co. v. Int'l Brotherhood of Teamsters, 561 U.S. 287, 297-99 (2010). Moreover, courts "should give to the party denying the agreement the benefit of all reasonable doubts and inferences that may arise." Magnolia Cap. Advisors, 272 F. App'x at 786.

The primary issue in this case is whether Plaintiff assented to the arbitration provision when she registered for her WSBTV.com account. Contracts formed through the internet are typically classified "by the way in which the user

purportedly gives [her] assent to be bound by the associated terms." <u>Berman v.</u>
<u>Freedom Fin. Network, LLC</u>, 30 F.4th 849, 865 (9th Cir. 2022) (Baker, J.,
concurring).[2]  In general, there are four ways to form an internet contract:  (1)
browsewraps; (2) clickwraps; (3) scrollwraps; and (4) sign-in wraps.

> A "*browsewrap*" agreement is one in which an internet user
> accepts a website's terms of use merely by browsing the site.  A
> "*clickwrap*" agreement is one in which an internet user accepts a
> website's terms of use by clicking an "I agree" or "I accept"
> button, with a link to the agreement readily available.  A
> "*scrollwrap*" agreement is like a "clickwrap," but the user is
> presented with the agreement and must physically scroll to the
> bottom of it to find the "I agree" or "I accept" button.  "*Sign-in*
> *wrap*" agreements are those in which a user signs up to use an
> internet product or service, and the sign-up screen states that
> acceptance of a separate agreement is required before the user
> can access the service. While a link to the separate agreement is
> provided, users are not required to indicate that they have read
> the agreement's terms before signing up.

<u>Id.</u> at 865-66.

Defendant argues that Plaintiff assented to the arbitration agreement through
a valid sign-in wrap, or alternatively, a valid browsewrap agreement.  Plaintiff, on
the other hand, asserts that "[m]erely placing a link to a website's Terms and
Conditions on a sign-up page without in any way indicating that taking an action

---

[2] The Court recognizes that it applies Georgia law in analyzing whether the parties agreed
to arbitrate.  The Court cites to the Ninth Circuit Court of Appeals here simply to provide
an overview of the types of internet contracts.

on that page will purportedly bind the user to detailed contractual provisions . . . falls woefully short of what is required to create a contract."  [Doc. 28, p. 6].

As stated above, Defendant first argues that Plaintiff assented to the arbitration agreement via a valid sign-in wrap.  The Court is not convinced that this is a sign-in wrap agreement.  Sign-in wraps agreements notify a user that "acceptance of a separate agreement is required before the user can access the service."  Babcock v. Neutron Holdings, Inc., 454 F. Supp. 3d 1222, 1230 (S.D. Fla. 2020).  Ordinarily, a sign-in wrap will typically say something like the following:  "By clicking Sign-Up, you are indicating that you have read and agree to the Terms of Service."  Kai Peng v. Uber Techs., Inc., 237 F. Supp. 3d 36, 48 n.12 (E.D.N.Y. 2017).

Here, the login through Facebook screen never informed Plaintiff that acceptance of a separate agreement was required before she could access the service, which is the defining feature of a sign-in wrap agreement.  See Berman, 30 F.4th at 869 (Baker, J., concurring).  Rather, the screen informed Plaintiff that by continuing, "Cox Media Group Memberships JR will receive ongoing access to the information you share and Facebook will record when Cox Media Group Members JR accesses it."  See Figure 1.  In sum, because the login screen did not contain language which would show that Plaintiff needed to agree to terms to sign up, the

Court finds that this was not a sign-in wrap agreement.  See Meyer v. Uber Techs., Inc., 868 F.3d 66, 76 (2d Cir. 2017) (stating that sign-in wrap agreements "advise the user that he or she is agreeing to the terms of service when registering or signing up").  Thus, to the extent that Defendant argues that Plaintiff assented to arbitration through a sign-in wrap agreement, the Motion to Compel is **DENIED**.

Defendant also argues that Plaintiff assented to the arbitration agreement through a valid browsewrap agreement.  As previously stated, browsewrap agreements generally post terms and conditions on a website via a hyperlink at the bottom of the screen.  The parties seem to agree that "browsewrap agreements are only enforced when (1) the user has actual knowledge of the terms and conditions, or (2) the hyperlink to the terms and conditions is conspicuous enough to put a reasonably prudent person on inquiry notice."[3]  Kravets v. Anthropologie, Inc., No. 22-cv-60443, 2022 WL 1978712, at *4 (S.D. Fla. June 3, 2022); see also Barney v. Grand Caribbean Cruises, Inc., No. 21-CV-61560, 2022 WL 159567 (S.D. Fla. Jan. 17, 2022).

---

[3] This rule aligns with Georgia law.  In Georgia, "[i]n determining whether there was a mutual assent, courts apply an objective theory of intent whereby one party's intention is deemed to be that meaning a reasonable man in the position of the other contracting party would ascribe to the first party's manifestations of assent."  Thornton v. Uber Techs., Inc., 858 S.E.2d 255, 258 (Ga. Ct. App. 2021).

The Court will assume that Plaintiff did not have actual knowledge of the terms and conditions.  The Court must thus decide whether the hyperlink to the terms and conditions was conspicuous enough to put a reasonably prudent person on inquiry notice.  In determining whether inquiry notice exists, <u>Bell v. Royal Seas Cruises, Inc.</u> is instructive:

> Whether a user has inquiry notice of a browsewrap agreement . . . depends on the design and content of the website and the agreement's webpage.  Where the link to a website's terms of use is buried at the bottom of the page or tucked away in obscure corners of the website where users are unlikely to see it, courts have refused to enforce the browsewrap agreement.  On the other hand, where the website contains an explicit textual notice that continued use will act as a manifestation of the user's intent to be bound, courts have been more amenable to enforcing browsewrap agreements.

No. 19-CV-60752, 2020 WL 5742189, at *6 (S.D. Fla. May 13, 2020) (quoting <u>Nguyen v. Barnes & Noble Inc.</u>, 763 F.3d 1171, 1177 (9th Cir. 2014)); <u>see also</u> <u>James v. Glob. TelLink Corp</u>, 852 F.3d 262, 267 (3d Cir. 2017) (stating that there is an "evolving body of caselaw regarding whether the terms and conditions in browsewrap agreements are enforceable, often turning on whether the terms or a hyperlink to the terms are reasonably conspicuous on the webpage" and whether "the website contains an explicit textual notice that continued use will act as a manifestation of the user's intent to be bound").  Ultimately, "the conspicuousness and placement of the 'Terms of Use' hyperlink, other notices given to the users of

the terms of use, and the website's general design all contribute to whether a

reasonably prudent user would have inquiry notice of a browsewrap agreement."

Nguyen, 763 F.3d at 1177.

The Court will first consider the conspicuousness and placement of the

"Terms" hyperlink.  The Court notes that the webpage at issue (Figure 1) is a

relatively uncluttered webpage.  Certainly, the hyperlink is not tucked away "in an

obscure corner of the [w]ebsite where a user is unlikely to encounter [it]."  Bell,

2020 WL 5742189, at *7.  Instead, the relevant hyperlink is placed directly below

the sentence that explains what happens when a user elects to continue registering

for a WSBTV.com account.  Notably, even though there is some separation, the

relevant hyperlink remains close to the button that a user must select to continue or

cancel.  Moreover, the Court notes that the hyperlink appears to be in the same size

font—not a smaller font—and is set off in a different color than the surrounding

text.  As a result, the Court finds that it is highly likely that a reasonable user

would see the "Terms" hyperlink.  To summarize, the Court easily finds that the

hyperlink is conspicuous, and therefore this factor weighs in favor of finding

inquiry notice.

The Court notes that "proximity or conspicuousness of the hyperlink alone is

not enough to give rise to constructive notice."  Nguyen, 763 F.3d at 1178.  Indeed,

courts should also consider whether the website contained an explicit textual notice that continued use of the website acts as a manifestation of the user's intent to be bound by an agreement.

Here, the Court recognizes that the website did not contain an explicit textual notice that continued use of the website demonstrates a user's intent to be bound by an agreement.  In other words, the website lacked language such as "By continuing, you agree to the Terms."  See Berman, 30 F.4th at 858.  Importantly, the lack of an explicit textual notice does not end the Court's inquiry—the Court must still assess whether a reasonably prudent user would have inquiry notice of the terms and conditions.

In the Court's view, the website at issue here "has features that put a reasonable user on notice that he or she is assenting to the Terms and Conditions." Bell, 2020 WL 5742189, at *6.  First, to complete the registration of the account, a user must press a continue button.  A user could not create an account or agree to terms merely through continued use of the website.  In other words, the user in this case must affirmatively act in order to be bound by any terms and conditions.

Second, while there was not an explicit textual notice, a reasonable user would know that there was some legal significance attached to the continue button. Indeed, the website states:  "By continuing, Cox Media Group Memberships JR

will receive ongoing access to the information you share and Facebook will record

when Cox Media Group Memberships JR accesses it.  Learn more about this

sharing and the settings you have."  Figure 1.  Immediately below that sentence

and directly after the user is invited to learn more, the following is written:  "Cox

Media Group Membership JR's Privacy Policy and Terms."  Id.  The website

makes clear that by pressing the continue button, the user agrees to certain

information sharing.  The user is then invited to "learn more" about the settings

that he or she has.  See Kravets, 2022 WL 1978712, at *4-5 (emphasizing that the

plaintiff was "invite[d] to "view additional terms and policies").  Immediately

following the invitation to learn more is a plainly clickable hyperlink to the

"Terms."  By requiring a user to press the continue button and by explaining the

legal significance of clicking on the continue button, the Court is unpersuaded by

Plaintiff's argument that she had no way of knowing that continuing would bind

her to terms and conditions.  Rather, the Court finds that a reasonable person

would understand that by agreeing to continue, she would be bound by the

information sharing provisions and the additional "Terms" contained in the

hyperlink.

In sum, the Court has considered the design and content of the webpage and

also whether the webpage contained an explicit textual notice.  After careful

consideration, the Court finds that the undisputed facts establish that the inquiry notice standard is satisfied and that Plaintiff manifestly assented to the Arbitration Provision when she pressed the continue button and signed up for her WSBTV.com account.  See id. at *6 (compelling the parties to arbitration after determining that a strikingly similar browsewrap agreement was enforceable). Therefore, because Plaintiff assented to arbitration through the browsewrap agreement, the Motion to Compel is **GRANTED**.

## CONCLUSION

For the reasons set forth above, Defendant's Motion to Compel Arbitration [Doc. 23] is **GRANTED**.  The parties are **ORDERED** to submit this case to arbitration.  It is **FURTHER ORDERED** that this action is **STAYED** and shall be **ADMINISTRATIVELY CLOSED** pending completion of arbitration pursuant to the arbitration provision in this case.  The parties shall notify the Court upon completion of arbitration, and either party shall have the right to move to reopen this case to resolve any remaining issues of contention.

**SO ORDERED** this 12th day of February, 2024.

J. P. BOULEE
United States District Judge